## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

GORDON NEWMAN                                   CIVIL ACTION

versus                                          NO. 09-4445

WARDEN BURL CAIN                                SECTION: "J" (1)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Gordon Newman, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On June 17, 1998, he was convicted of first degree murder in

violation of Louisiana law.[1]  After numerous delays, he was sentenced on June 17, 2003, to a term

of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On July 7,

2004, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[3]  The

Louisiana Supreme Court then denied his related writ application on January 7, 2005.[4]

Petitioner, through counsel, then filed with the state district court an application for

post-conviction relief on November 22, 2005,[5] as well as a supplemental application on May 25,

2007.[6]  On February 28, 2008, the state district court denied all of petitioner's claims except for a

claim based on "newly discovered evidence"; with respect to that one claim, the court granted relief

and ordered a new trial.[7]  Both the state and petitioner sought supervisory writs.  On June 19, 2008,

the Louisiana Fourth Circuit Court of Appeal granted the state's application and reversed the trial

court's judgment granting relief.[8]  On July 15, 2008, the Court of Appeal denied petitioner's writ

---

[1] State Rec., Vol. XII of XVI, trial transcript, p. 255; State Rec., Vol. IX of XVI, minute entry dated June 15, 1998.

[2] State Rec., Vol. IX of XVI, minute entry dated June 17, 2003.

[3] State v. Newman, 879 So.2d 870 (La. App. 4th Cir. 2004) (No. 2003-KA-1721); State Rec., Vol. XIII of XVI.

[4] State v. Newman, 891 So.2d 668 (La. 2005) (No. 2004-K-2050); State Rec., Vol. XIV of XVI.

[5] State Rec., Vol. XV of XVI.

[6] State Rec., Vol. XV of XVI.

[7] State Rec., Vol. XV of XVI, transcript of February 28, 2008; State Rec., Vol. XV of XVI, minute entry dated February 28, 2008.

[8] State v. Newman, No. 2008-K-0349 (La. App. 4th Cir. June 19, 2008) (unpublished); State Rec., Vol. XV of XVI.

application.[9]   The Louisiana Supreme Court then likewise denied petitioner's related writ applications on May 22, 2009.[10]

On July 1, 2009, petitioner filed the instant federal application for *habeas corpus* relief.[11]  In support of his application, he asserts the following claims:

1.      Newly discovered evidence proves petitioner is innocent;

2.      Petitioner received ineffective assistance of counsel;[12]

3.      Petitioner was denied his right to a fair trial because two jurors failed to reveal their biases during voir dire;[13] and

4.      Petitioner was denied equal protection of law due to discrimination in the selection of the grand jury foreperson.

On December 17, 2009, the state filed a response arguing that the federal application should be dismissed with prejudice.[14]  On March 7, 2010, petitioner filed a reply to that response.[15]

---

[9] State v. Newman, No. 2008-K-0813 (La. App. 4th Cir. July 15, 2008); State Rec., Vol. XV of XVI.

[10]   State v. Newman, 9 So.3d 134 (La. 2009) (No. 2008-KP-1621); State *ex rel.* Newman v. State, 9 So.3d 134 (La. 2009) (No. 2008-KH-1646); State Rec., Vol. XVI of XVI.

[11]   Rec. Doc. 3.

[12]   This claim was set forth as both the second and third claims in petitioner's federal application.

[13]  This claim was set forth as both the fourth and fifth claims in the federal application.

[14]  Rec. Doc. 9.

[15]  Rec. Doc. 12.

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A).[16]

As noted, the Louisiana Supreme Court denied petitioner's writ application on direct review on January 7, 2005. Therefore, under § 2244(d)(1)(A), his conviction and sentence became "final" no later than April 7, 2005, when his period expired for seeking a writ of certiorari from the United States Supreme Court. <u>See</u> <u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003); <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999); <u>Chester v. Cain</u>, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); <u>see also</u> U.S. Sup. Ct. R. 13(1). Accordingly, his one-year period for seeking federal *habeas corpus* relief commenced on that date and expired one year later, unless that deadline was extended by tolling.

The Court first considers statutory tolling. The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2).

After two hundred twenty-eight (228) days elapsed, petitioner tolled the federal limitations period on November 22, 2005, by filing a post-conviction application with the state

---

[16] Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

district court.  Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as he sought supervisory review in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).

The state argues that tolling ceased when petitioner failed to file a timely writ application with the Louisiana Fourth Circuit Court of Appeal after the state district court's judgment on February 28, 2008.  Because his writ application was not filed with the Court of Appeal until June of 2008,[17] it does in fact appear that he did not seek review within the thirty days allowed by state law.  See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3; see also Melancon v. Kaylo, 259 F.3d 401, 404-06 (5th Cir. 2001); Campbell v. Cain, Civ. Action No. 06-3983, 2007 WL 2363149, at *3 & n.24 (E.D. La. Aug. 15, 2007).  However, the Court of Appeal did *not* deny petitioner's writ application as untimely; instead, the court expressly denied the claims on the merits, holding: "Relator's claims in his application for post-conviction relief were reviewed.  Relator has failed to demonstrate that he is entitled to relief.  There is no error in the district court's February 28, 2008 judgment."[18]

In Grillette, the United States Fifth Circuit Court of Appeals faced a similar scenario and found that tolling continued uninterrupted.  The Fifth Circuit held:

> [A]t no point did the state trial court or the Louisiana Court of Appeal fault Grillette for failure to comply with Rule 4-3.  Whereas in Melancon, the Louisiana Court of Appeal expressly indicated that Melancon's application "appeared untimely," in this case it is

---

[17] See State Rec., Vol. XV of XVI, Cross-Application for Writ of Review dated June 16, 2008.

[18] State v. Newman, No. 2008-K-0813 (La. App. 4th Cir. July 15, 2008); State Rec., Vol. XV of XVI.

undisputed that the Louisiana Court of Appeal disposed of Grillette's application "on the merits," without any notation that his application was time-barred.  We acknowledge, as the State asserts, that a state court's consideration of an application "on the merits" is not by itself conclusive proof that the application was timely filed in accordance with that state's timeliness laws and rules and thus "pending."  See [Carey v.] Saffold, 536 U.S. [214,] 226, 122 S.Ct. 2134 [(2002)] (noting different reasons why a court might "address the merits of a claim that it believes was presented in an untimely way").  *Rule 4-3, however, prohibits the Court of Appeal from considering the merits of an application that is not filed with the appellate court within the original or extended return date, "in the absence of a showing that the delay in filing was not due to the applicant's fault."  Because the Court of Appeal did consider the merits of Grillette's application, it must have determined that the application was timely either because the trial court impliedly extended the return date and/or because the delay was not due to Grillette's fault.*

Moreover, as Grillette correctly points out, when the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions.  See, e.g., Carter v. Rhea, 785 So.2d 1022, 1022 (La.Ct.App. 4th Cir. 2001) ("WRIT APPLICATION DISMISSED AS UNTIMELY."); Lawyer v. Succession of Kountz Through Cupit, 703 So.2d 233, 233 (La.Ct.App. 4th Cir. 1997) ("WRIT NOT CONSIDERED."); Watts v. Dorignac, 681 So.2d 955, 955 (La.Ct.App. 1st Cir. 1996) ("WRIT NOT CONSIDERED").  *Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion.*

Grillette, 372 F.3d at 775 (emphasis added).

This Court should not unilaterally ignore the presumptions employed in Grillette.

Bourgeois v. Bergeron, Civ. Action No. 09-3185, 2009 WL 5088756, at *4 (E.D. La. Dec. 23, 2009).

Therefore, out of an abundance of caution, the Court will toll the federal limitations period in the

instant case from November 22, 2005, the date the post-conviction application was filed, until May 22, 2009, the date the Louisiana Supreme Court denied the related writ applications.[19]

At that point, petitioner had one hundred thirty-seven (137) days of the federal limitations period remaining.  Because he filed his federal application a mere forty (40) days later on July 1, 2009,[20] the application is timely.  In light of that fact and the state's concession that petitioner exhausted his claims in state court,[21] the Court will address the merits of his claims.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

---

[19]   The state does not challenge the timeliness of the Louisiana Supreme Court writ applications, and the record reflects that those applications were in fact timely filed.

[20] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner deposited his application in the prison mailing system on July 1, 2009.  See Rec. Doc. 3, p. 14.

[21]   Rec. Doc. 9, p. 1.

clearly established Federal law, as determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

### Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> On the night that Mr. [Romero] Dupre was killed, Mr. [Gordon] Newman and Anthony Shelton went to a residence on Telemachus Street in New Orleans to purchase drugs. According to the trial testimony of Raymond Sias, Mr. Dupre had arranged to sell cocaine to Mr. Newman and had requested that Mr. Sias "front" the sale for him, meaning that Mr. Sias would make it appear to Mr. Newman and Mr. Shelton that Mr. Sias was actually the seller of the drugs.

The four men had agreed to meet at the Telemachus Street house where Vernon York, a close friend of Mr. Sias, lived. Mr. Sias had previously lived with Mr. York on Telemachus Street and still had a key to the house. Mr. Sias had arranged with Mr. York to use the house on the evening of the drug transaction.

According to Mr. Sias' testimony, on the day that Mr. Dupre was killed, Mr. Newman and Mr. Shelton met with Mr. Sias and Mr. Dupre, first at Mr. Newman's home and then later at a daiquiri shop. They met at Mr. Newman's home to discuss the details of the drug transaction and at the daiquiri shop to confirm that Mr. Newman and Mr. Shelton had obtained the money needed to buy the drugs. Once Mr. Dupre and Mr. Sias were satisfied that Mr. Newman and Mr. Shelton had the money, all four men left the daiquiri shop. Mr. Dupre and Mr. Sias left in one vehicle, and Mr. Newman and Mr. Shelton followed them in Mr. Shelton's jeep. The men drove around for some time to make certain that their vehicles were not being followed. When the four men finally arrived at the house on Telemachus Street, Mr. Shelton remained in his jeep with the money that was to be used to buy the drugs, and the other three men went inside the house.

Mr. Sias testified that Mr. Newman was very nervous, because he was concerned that someone might be inside the house, waiting to rob him. Therefore, Mr. Sias and Mr. Dupre invited Mr. Newman into the house so that he could verify that no one was there to rob him.

Mr. Sias testified further that Mr. Dupre and Mr. Newman went into the second room of the house where Mr. Newman was apparently shown the drugs that he was to buy. Mr. Sias stayed by the front door of the house, which he had locked with a deadbolt key.

Mr. Newman indicated that he was satisfied with the drugs he was to buy, and he asked Mr. Sias to unlock the front door so that he could ask Mr. Shelton to bring the money inside. When Mr. Newman walked outside of the house, he called to Mr. Shelton to bring the money. He then turned, pulled a gun from his waistband, and shot Mr. Sias in the head. As Mr. Sias fell on the front porch of the house, he heard Mr. Newman yell to Mr. Shelton, "Get the shotgun for this motherfucker."

Before he lost consciousness, Mr. Sias heard a car door close, and then he heard a series of gunshots. At the trial, Mr. Sias testified that he believed that he had been shot with a nine millimeter gun. Mr. Dupre had been fatally wounded.

Richard LeBlanc, a detective assigned to the homicide unit of the New Orleans Police Department (the "NOPD"),[FN1] was the lead detective in this case. When Detective LeBlanc arrived at the scene of the shootings, Mr. Sias and Mr. Dupre's body had already been moved from the scene. Detective LeBlanc observed a pool of blood, a bullet casing, keys, and some change on the front porch of the Telemachus Street house. Inside the house he saw blood and additional bullet casings in the second room of the house. Toward the rear of the house, just outside of the kitchen door, he observed more blood, a bullet fragment, two more bullet casings, and two bullet holes in the floor. The kitchen door also had bullet holes in it. In an open dresser in a bedroom, a nine millimeter handgun and nine clear, plastic bags of a green vegetable matter, which was believed to be marijuana, were found.

[FN1] At the time of the trial Mr. LeBlanc was no longer employed by the NOPD, but we will still refer to him as Detective LeBlanc.

During his investigation Detective LeBlanc found a nine millimeter handgun in an alley approximately one block from the Telemachus Street house. Across the street from the alley where the gun was found, Detective LeBlanc found and seized a brick-shaped object from a hedge. The object appeared to be cocaine to the detective.[FN2]

[FN2] At the trial the parties stipulated that testing of the object confirmed that it was cocaine. There was also a stipulation that the object, the firearms, and the ammunition were tested for fingerprints and did not yield any fingerprints that were identifiable.

While Detective LeBlanc was working at the crime scene, Mr. York, who lived at the Telemachus Street house, arrived. He was interviewed by the detective, and to account for his whereabouts at the time Mr. Dupre was killed, he provided a receipt for purchases that he had made at a store earlier that evening. Based on the time on the receipt and the fact that the items listed on the receipt were in Mr. York's truck, Detective LeBlanc concluded that Mr. York had not been involved in the crime that had occurred that night.

Several days after the shootings the NOPD homicide unit received information that one of the people involved in the shootings

was Mr. Newman.  Detective LeBlanc obtained a photograph of Mr. Newman and prepared a photographic line-up.  A few days later he met with Mr. Sias, who viewed the line-up and identified Mr. Newman as the person who shot him.  Mr. Sias also made an in-court identification of Mr. Newman at the trial.

Detective LeBlanc testified that Mr. Shelton was also developed as a suspect in the shootings.  A few days after Mr. Sias identified Mr. Newman, Detective LeBlanc conducted a second photographic line-up.  Mr. Shelton's picture was in that line-up, and Mr. Sias identified Mr. Shelton [FN3] as another person who was at the Telemachus Street residence when the shooting occurred.

> [FN3] Mr. Shelton was killed a few days after he was identified by Mr. Sias but before he could be apprehended by the police.  At the trial Detective LeBlanc testified that the police never developed a link between the killing of Mr. Dupre and the killing of Mr. Shelton.

Prior to the positive photographic line-up identifications by Mr. Sias, he had been shown a photographic line-up containing the photograph of Hosea Brown, who had been identified in a tip to police as the person who placed the brick of cocaine in the hedge where it was found.  Mr. Sias failed to identify Mr. Brown, however.

After the shooting, Mr. Newman left New Orleans.  He was arrested in Los Angeles, California seven months after the crime and was returned to New Orleans to stand trial.

At the trial Dr. Richard Tracy, an expert in forensic pathology, testified that he had conducted an autopsy on Mr. Dupre's body.  From the autopsy Dr. Tracy determined that Mr. Dupre had been shot seven times with two different types of bullets.  Only one wound was fatal, and that wound was inflicted by a .38 caliber bullet. The other wounds were caused by nine millimeter bullets.  Dr. Tracy could not determine in what order the bullets were shot, but he was able to determine that the entry wounds showed that Mr. Dupre had been in various positions during the shooting.  Two of the bullet wounds, including the fatal chest wound, left powder marks on Mr. Dupre's skin, indicating that a gun was discharged between two and fifteen inches from his body.  Dr. Tracy testified that toxicology tests conducted in connection with the autopsy showed that there were no illegal substances in Mr. Dupre's body but that he had a blood alcohol level of 0.01 percent.

NOPD Officer Kenneth Leary, an expert in the field of ballistics and the identification of firearms, testified at the trial regarding his examination of the evidence in this case. He determined that the nine millimeter gun that was found in the alley matched two of the nine millimeter bullets that had been recovered at the autopsy of Mr. Dupre's body and one of the bullets that was found at the scene of the shooting. Of the eleven casings that Officer Leary examined, all of them matched the nine millimeter gun that had been found. Officer Leary also testified that there were three .38 caliber copper bullet jackets found on the scene or recovered at the autopsy. Two of these were definitely fired from the same gun, but the third bullet jacket was deformed such that Officer Leary could not be certain that the deformed jacket was fired from the same gun that fired the other two .38 caliber bullet jackets. Therefore, he could not be absolutely certain that there were only two guns involved in the shootings.

Mr. Dupre's cousin, Terry McCloughin, testified at the trial. He said that he saw Mr. Dupre in the morning on the day that Mr. Dupre was killed and that Mr. Dupre told him then about the drug transaction involving Mr. Newman. Mr. McCloughin further testified that Mr. Newman and Mr. Dupre were friends.

Tyrone Smith also testified at the trial. Mr. Smith testified that he lived in the neighborhood where the Telemachus Street house was located and that on the night of the shootings, he went outside when he heard what sounded to him like firecrackers. He said that he looked at the porch of the house where the shootings took place and saw two people, one of whom was falling. He testified that the second person that he saw went inside the house. Mr. Smith further said that he approached the house and heard two voices that sounded like two people yelling at each other. He determined that someone was dead in the kitchen based on the conversation that he heard. The man who had been on the porch with the man who had been shot came back outside, went into the street, and turned right toward a canal. A second person then came running from the house, and he turned toward Xavier University. Mr. Smith then saw a black jeep coming down the street.

Mr. Smith tried to follow the jeep, but he was not able to do so. He then ran to the Xavier University security office, which was nearby, to request help. Mr. Smith said that he had not seen any of the parties well enough to be able to identify them.

After Mr. Smith testified, the defense recalled Detective LeBlanc and questioned him regarding the statements that Mr. Smith

had made on the night of the shootings. Mr. Smith had told Detective LeBlanc that he was in his garage when he heard gunshots. Mr. Smith said that he then ran outside and saw a black male running away and a black jeep driving toward Washington Avenue. Mr. Smith did not tell Detective Leblanc that he had observed the actual shooting of the man he saw on the porch, and he did not report to Detective LeBlanc that he had heard a conversation involving the perpetrators, although Mr. Smith's testimony at the trial covered these points.

The defense also sought to discredit Mr. Sias' testimony, and Mr. Sias did admit on cross examination that he had not told the police that he and Mr. Dupre were engaged in a drug transaction with Mr. Newman when he had first been questioned. He also admitted that he had two prior convictions for selling drugs, one in Virginia and one in Maryland. He further admitted that he would face a life sentence as a three time offender if he were convicted of a violent crime in Louisiana, but he denied that the police or district attorney's office had offered him any consideration for his testimony in this case. Mr. Sias also admitted that he was not shocked to learn that the police had found marijuana packaged for sale at Mr. York's Telemachus Street home, and he knew that Mr. York owned a gun. He denied, however, that he and Mr. Dupre were armed the night that Mr. Dupre was killed. Finally, Mr. Sias denied that he knew the amount of cocaine that Mr. Dupre was planning to sell to Mr. Newman or the purchase price that Mr. Dupre was to receive, although he believed the amount to be at least two kilograms and the price to be $25,000 per kilogram.

When Detective LeBlanc was recalled to the stand, he also testified that Mr. Sias had told detectives on two occasions that he and Mr. Dupre arrived at the Telemachus Street house approximately an hour and a half before Mr. Newman and Mr. Shelton arrived. Additionally, Detective LeBlanc testified that Mr. Sias had never mentioned to him that there had been a meeting at Mr. Newman's house earlier in the day or that there had been a second meeting at a daiquiri shop. Finally, Detective LeBlanc testified that Mr. Sias had not previously told him that Mr. Shelton was waiting outside in his vehicle when Mr. Newman first entered the Telemachus Street house. In fact, Mr. Sias had told Detective LeBlanc that everyone had been

inside the house conducting a business transaction prior to the shooting.[22]

Actual Innocence

Petitioner's first claim is that his conviction is unconstitutional because "newly discovered evidence" demonstrates that he is actually innocent.[23] Petitioner misunderstands the essential nature of federal *habeas corpus* relief. As Justice Holmes noted long ago, what a federal *habeas* court has "to deal with is *not* the petitioner['s] innocence or guilt but *solely* the question whether [his] constitutional rights have been preserved." Moore v. Dempsey, 261 U.S. 86, 87-88 (1923) (emphasis added). The Supreme Court reiterated that view seventy years later, noting:

> Claims of actual innocence based on newly discovered evidence have *never* been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. ... This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – *not* to correct errors of fact.

Herrera v. Collins, 506 U.S. 390, 400 (1993) (emphasis added); see also Kincy v. Dretke, 92 Fed. App'x 87, 92 (5th Cir. 2004); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *22 (E.D. La. Mar. 8, 2010); Bolton v. Cooper, Civ. Action No. 07-626, 2007 WL 2713259, at *4 (E.D. La. Sept. 14, 2007). When a convicted inmate uncovers new evidence tending to prove his innocence, his recourse is to seek executive

---

[22] State v. Newman, 879 So.2d 870, 872-76 (La. App. 4th Cir. 2004) (No. 2003-KA-1721); State Rec., Vol. XIII of XVI.

[23] The "newly discovered evidence" was the location of a person, Arthur Eugene, who was allegedly at the scene of the crime and willing to testify that petitioner was not involved in the shooting.

clemency, not federal *habeas corpus* relief. Herrera, 506 U.S. at 417; Higgins, 2010 WL 890998, at *22.

Ineffective Assistance of Counsel

Petitioner next claims that he received ineffective assistance of counsel. In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Id. at 697. Petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel fell within a wide range of reasonable representation. See Crockett v.

McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

If the Court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decisions rejecting petitioner's ineffective assistance claims unless those decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the Court finds that neither of those conditions is met in the instant case.

Petitioner's first contention is that his counsel was ineffective for failing to procure and present evidence in support of the motion to quash the indictment based on racial discrimination in the selection of grand jury forepersons. Even if the Court assumes that counsel performed

deficiently in this respect, petitioner cannot show the prejudice required to support his claim.  Had

counsel presented such evidence and succeeded in having the indictment quashed, the state could

simply have sought and obtained a second indictment.  Therefore, nothing would have been

accomplished except a delay in the proceedings, and that would not have affected the ultimate

outcome of the case.  Accordingly, petitioner cannot demonstrate that he was prejudiced by his

counsel's failure and so cannot meet his burden under Strickland.  See Pickney v. Cain, 337 F.3d

542, 546 (5th Cir. 2003); Schexnayder v. Cain, Civ. Action No. 08-294, 2009 WL 3242552, at *10

(M.D. La Oct. 8, 2009); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *6  (E.D. La.

Mar. 20, 2008).

Petitioner's second and third contentions are that his counsel was ineffective for

failing to adequately question jurors Kathleen Barbizon and Yvette Cage during voir dire.  The

Louisiana Fourth Circuit Court of Appeal rejected these contentions on direct appeal, holding:

> With regard to raising on appeal a claim of ineffective
> assistance of counsel, the Louisiana Supreme Court stated in State v.
> Prudholm, 446 So.2d 729 (La. 1984), that a "defendant's remedy is
> through post conviction relief in the trial court where the quality of
> the attorney's assistance can be fully developed and explored."  Id.
> at 737.  In State v. Ratcliff, 416 So.2d 528 (La. 1982), however, the
> Louisiana Supreme Court determined that "[s]ince the record
> discloses evidence needed to decide the issue of ineffective assistance
> of counsel and that issue was raised by assignment of error on appeal,
> in the interest of judicial economy we will address the issue now".
> Id. at 530.  See also State v. Seiss, 428 So.2d 444 (La. 1983).  In the
> instant case, this Court finds that an evidentiary hearing at the trial
> court level is not necessary, because the record before us is sufficient
> for the determination of counsel's effectiveness at trial.
>
> In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,
> 80 L.Ed.2d 674 (1984), the Supreme Court of the United States
> articulated the test for determining the effectiveness of a criminal
> defendant's counsel as follows:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. 2052.

Louisiana courts have adopted the two-pronged test established in the <u>Strickland</u> case for determining the effectiveness of counsel. <u>See, e.g.</u>, <u>State v. Fuller</u>, 454 So.2d 119 (La. 1984); <u>State v. Wilson</u>, 2000-1736 (La.App. 4 Cir. 11/14/01), 803 So.2d 102.

In <u>State v. LaCaze</u>, 99-0584 (La. 1/25/02), 824 So.2d 1063, the Louisiana Supreme Court discussed the effective assistance of counsel that a criminal defendant is afforded. The Supreme Court stated as follows:

A criminal defendant is guaranteed the effective assistance of counsel. U.S. Sixth Amendment; La. Const. art. I § 13. To prevail on a claim of ineffective assistance, a defendant must demonstrate (1) that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's errors or omissions resulted in prejudice so great as to undermine confidence in the outcome. The Sixth Amendment does not guarantee "errorless counsel [or] counsel judged ineffective by hindsight," but counsel reasonably likely to render effective assistance. *Judicial scrutiny must be "highly deferential" and claims of ineffective assistance are*

*to be assessed on the facts of the particular case as seen from "counsel's perspective at the time," hence, courts must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."*

99-0584, p. 20; 1078-79 (footnotes omitted and emphasis added).

In <u>State v. Brooks</u>, 505 So.2d 714 (La. 1987), the Louisiana Supreme Court stated that "hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." <u>Id</u>. at 724. This Court has also recognized that if the trial counsel's actions fall "within the ambit of trial strategy", they do not "establish ineffective assistance of counsel." <u>State v. Bienemy</u>, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986).

In the instant case Mr. Newman claims that he received ineffective assistance from his trial counsel, because his trial counsel failed to conduct an adequate voir dire on the issue of the potential jurors' prior relationships with Mr. Dupre and on the issue of the potential jurors' employment in the field of law enforcement. Additionally, Mr. Newman complains that his trial counsel should have produced evidence at the motion for a new trial to show that one of the jurors had a significant relationship with Mr. Dupre.

We find no evidence that the failure of Mr. Newman's trial counsel to inquire about the ties of any of the potential jurors to law enforcement in any way prejudiced Mr. Newman. At the hearing on the motion for a new trial, the juror who admittedly had prior law enforcement experience testified that her background not only did not affect her ability to serve as a fair and impartial juror, it may have resulted in Mr. Newman receiving a life sentence in lieu of the death penalty. We also note that at the time of the trial the juror was no longer employed as a probation officer and that she had only worked as such for one year. She was clearly not a career law enforcement officer.

In the case of the alleged relationship between one of the jurors and Mr. Dupre, there is nothing in the record to substantiate any such relationship. Further, there is nothing in the record to support a finding that the failure of this juror to testify at the hearing on the motion for a new trial was through any fault on the part of the trial counsel. This juror was unable to be served, a circumstance that was beyond the control of Mr. Newman's counsel.

We do not find that Mr. Newman's trial counsel either prejudiced Mr. Newman's defense or failed to furnish him with the representation to which he was entitled under the state and federal constitutions. Mr. Newman's assignment of error is without merit.[24]

It has been noted that jury selection is "more an art than a science." Romero v. Lynaugh, 884 F.2d 871, 878 (5th Cir. 1989). Taking that into account, the United States Fifth Circuit Court of Appeals has observed, "The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts." Id. The Fifth Circuit has further held:

> [An] attorney's actions during voir dire are considered to be a matter of trial strategy. A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.

Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995) (quotation marks omitted).

In the instant case, even if the Court were to assume that counsel performed deficiently in failing to inquire during voir dire whether the prospective jurors knew the victim or worked in law enforcement, petitioner's ineffective assistance of counsel claim would still fail because he cannot show that any prejudice resulted. To establish prejudice, petitioner must show that, but for his attorney's failures, the result of the proceeding would have been different. See Wilson v. Dretke, No. 3:01-CV-1082, 2003 WL 22976625, at *4 (N.D. Tex. Dec. 10, 2003) (Ramirez, M.J.), adopted, 2004 WL 57165 (N.D. Tex. Jan. 6, 2004) (Sanders, J.), appeal dismissed,

---

[24]  State v. Newman, 879 So.2d at 884-86; State Rec., Vol. XIII of XVI.

111 Fed. App'x 767 (5th Cir. 2004). In the instant case, the state presented compelling evidence at

trial that petitioner was guilty of first degree murder,[25] and petitioner simply cannot show that he

---

[25] The Louisiana Fourth Circuit Court of Appeal thoroughly reviewed that evidence and found that it was more than sufficient to support petitioner's conviction. That court noted:

> La. R.S. 14:30 defines first degree murder, in relevant part, as follows:
>
> > A. First degree murder is the killing of a human being:
> > ....
> > (3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
> > ....
> > (6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance....
>
> La. R.S. 14:24 states that "[a]ll persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense ... [or] aid and abet in its commission ... are principals."
>
> There is no question in this case that Mr. Dupre, a human being, was killed. Also, Mr. Newman does not dispute that he was present at the Telemachus Street residence on the night Mr. Dupre was killed and that he was there to purchase cocaine, a controlled dangerous substance.
>
> Mr. Newman complains that the State's entire case is based on the testimony of Mr. Sias, uncorroborated by any physical evidence. Mr. Newman further argues that the testimony given by Mr. Sias at the trial conflicted with Mr. Sias' own pretrial statements. Additionally, Mr. Newman argues that, even according to Mr. Sias' testimony, Mr. Newman was armed with a nine millimeter gun. Because Mr. Dupre was killed by a bullet from a .38 caliber gun, Mr. Newman claims that he could not have killed Mr. Dupre.
>
> Although at trial Mr. Sias' testimony conflicted with previous statements he had made to Detective LeBlanc, the inconsistencies were related to the drug transaction in which he participated, not to the shootings that occurred. Mr. Sias' trial testimony regarding the gunshot wound he received did not deviate from any prior statements that he had made. Additionally, Mr. Sias' testimony that he was shot with a nine millimeter gun was corroborated by the testimony of Officer Leary, a ballistics expert, and the testimony of Dr. Tracy, an expert in forensic pathology. Dr. Tracy testified that Mr. Dupre was shot multiple times with a nine millimeter

would not have been convicted if only his counsel had conducted a more probing voir dire.[26]

Therefore, this claim has no merit. See Dickson v. Thompson, No. 99-36233, 2000 WL 1593414

(9th Cir. Sept. 13, 2000); Forman v. Cain, Civ. Action No. 07-4200, 2008 WL 1746710, at *6 n.11

(E.D. La. Apr. 14, 2008); Bolton v. Cooper, Civ. Action No. 06-0227, 2007 WL 1701900, at *6

---

> weapon. Officer Leary's testimony established that both Mr. Sias and Mr. Dupre had been wounded with the same nine millimeter gun that was found near the scene of the crime.
>
> Mr. Newman argues that specific intent to kill or inflict great bodily harm, an element of first degree murder, was not established by the State. In State v. Tate, 2001-1658, p. 7 (La. 5/20/03), 851 So.2d 921, 930, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004), the Louisiana Supreme Court stated that "so long as the State sufficiently proves that the defendant is a principal and that he possessed the requisite specific intent, a conviction for first degree murder will be upheld." Further, "[s]pecific intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused." 2001-1658, p. 8, 851 So.2d at 930.
>
> In this case there were a number of circumstances from which a rational trier of fact could have concluded that Mr. Newman had the specific intent to kill or to inflict great bodily harm upon Mr. Dupre. First, there was evidence that Mr. Newman shot Mr. Sias in the head at very close range and that the same gun that was used to shoot Mr. Sias was used to shoot Mr. Dupre numerous times. Mr. Dupre was shot with this gun in the torso, both from the front and the back, in the head, and in other areas of his body. Clearly, shooting Mr. Dupre in the torso and in the head evidences a specific intent on the part of the shooter at least to commit great bodily harm to Mr. Dupre. Further, Mr. Newman does not deny that he was participating in a drug transaction with Mr. Dupre when Mr. Dupre was shot. Therefore, even if the fatal wound were inflicted by someone other than Mr. Newman, Mr. Newman was a principal to the crime because of his intention to kill or inflict great bodily harm upon Mr. Dupre. Thus, he was as culpable as any other person who may have fired the fatal shot. La. R.S. 14:24.

State v. Newman, 879 So.2d at 877-78 (footnote omitted); State Rec., Vol. XIII of XVI.

---

[26]  This is especially true in light of the fact that, as discussed later in this opinion, petitioner has never shown that either Barbizon or Cage was unwilling or unable to decide the case impartially according to the law and the evidence.

(E.D. La. June 11, 2007); Horne v. Secretary, Florida Department of Corrections, No. 6:06-cv-0317-Orl-31, 2007 WL 779129, at *5 (M.D. Fla. Mar. 8, 2007); Baldwin v. Johnson, No. 1:02CV357, 2006 WL 2468779, at *14 (M.D. Miss. Aug. 23, 2006); Parker v. Turpin, 60 F. Supp.2d 1332, 1364 (N.D. Ga. 1999), aff'd, 244 F.3d 831 (11th Cir. 2001).[27]

Petitioner's fourth contention is that his counsel was ineffective for failing to have petitioner testify at trial. "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987). However, petitioner does not allege that his counsel refused to allow him to testify; rather, he alleges merely that "counsel would always assure petitioner that testifying would not be necessary because everything was under control."[28]

---

[27] To the extent that petitioner is also contending that his counsel was ineffective at the hearing on the motion for new trial when presenting the claim regarding Cage, that claim fares no better. If petitioner is faulting counsel's failure to have Cage testify at the hearing, that contention has no merit because the attempts to serve Cage with a subpoena were unsuccessful. If petitioner is faulting counsel for failing to subpoena another individual, Rasheed Lacour, there is no basis for concluding that Lacour's testimony would have been helpful. In an affidavit, Lacour stated only that Cage "knew" Dupre and that they had been seen together on the Xavier University campus "[o]n several occasions." State Rec., Vol. XIII of XVI, Affidavit of Rasheed Lacour. However, as noted later in this opinion, the mere fact that Cage knew Dupre did not render her ineligible to serve on the jury. See Montoya v. Scott, 65 F.3d 405, 419-20 (5th Cir. 1995); Jones v. Butler, 864 F.2d 348, 362 (5th Cir. 1988); Howard v. Davis, 815 F.2d 1429, 1431 (11th Cir. 1987). Rather, the dispositive issue is whether their acquaintance affected Cage's ability to serve impartially. There is nothing to suggest that Lacour could testify on that issue even if he had been subpoenaed. Accordingly, petitioner cannot show that he was prejudiced by counsel's failure to subpoena Lacour.

[28] Rec. Doc. 3, p. 41. Out of an abundance of caution, and lest petitioner attempt to make such a contention in any objections he may file with respect to this Report and Recommendation, the Court further notes that a petitioner's bare allegations that his counsel refused to permit him to testify are insufficient to trigger either the granting of relief or further fact-finding by this Court. As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); see also United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002). Further, such a matter is inherently one of trial strategy, and the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be

---

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
>
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); see also Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *12-13 (E.D. La. Oct. 16, 2009); Mosley v. Cain, Civ. Action No. 06-6259, 2009 WL 2982930, at *4-5 (E.D. La. Sept. 14, 2009); Swinner v. Cain, Civ. Action No. 06-10694, 2009 WL 2045983, at *10-11 (E.D. La. July 13, 2009); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005).

considered sound trial strategy.  Strickland, 466 U.S. at 689.  Regarding such matters of trial

strategy, the United States Fifth Circuit Court of Appeals has noted:

> Strategic choices made after thorough investigation of law and facts
> relevant to plausible options are *virtually unchallengeable*.
> Moreover, a conscious and informed decision on trial tactics and
> strategy cannot be the basis of constitutionally ineffective assistance
> of counsel unless it is so ill chosen that it *permeates the entire trial*
> *with obvious unfairness.*

St. Aubin v. Quarterman, 470 F.3d 1096, 1102 (5th Cir. 2006) (internal quotation marks, brackets,

and citations omitted) (emphasis added).

That presumption of effectiveness is particularly applicable with respect to claims

such as this one.  As the United States First Circuit Court of Appeals has noted:

> The decision whether to call a particular witness is almost always
> strategic, requiring a balancing of the benefits and risks of the
> anticipated testimony.  The witness may not testify as anticipated or
> the witness's demeanor or character may impress the jury
> unfavorably and taint the jury's perceptions of the accused; or the
> testimony, though sympathetic, may prompt jurors to draw inferences
> unfavorable to the accused.

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted).  The court continued:

> Reasonably competent trial counsel might well have determined that
> the best prospect for acquittal lay in discrediting the government's
> witnesses, rather than presenting additional testimony which could
> appear to legitimate the government's case or raise questions about
> the defense not previously suggested by the government's evidence.

Id.

The instant *habeas* proceeding is far removed from the context of the actual trial, and

this Court has no mechanism available to fairly judge counsel's assessment of his own client at the

time and counsel's view of the strength of the prosecution's case as it was presented live.  Under

these circumstances and in light of the foregoing law regarding the deference that must be accorded to counsel's strategic decisions, the Court declines to second-guess counsel's decision not to put petitioner on the stand. This Court simply cannot find that counsel performed deficiently by failing to have petitioner testify at trial.

Lastly, petitioner argues that even if the contentions regarding counsel's ineffectiveness do not warrant relief when considered individually, relief is warranted if they are considered cumulatively. This Court disagrees. Where, as here, the individual contentions are meritless, that result cannot be changed simply by asserting them collectively. Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000); Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *17 (E.D. La. June 6, 2008); Simms v. Cain, Civ. Action No. 07-966, 2008 WL 624073, at *26 (E.D,. La. Mar. 8, 2008); Spicer v. Cain, Civ. Action No. 07-3770, 2007 WL 4532221, at *10 (E.D. La. Dec. 19, 2007); Franklin v. Thompson, Civ. Action No. 07-543, 2007 WL 3046642, at *13 (E.D. La. Oct. 17, 2007). As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error: "Twenty times zero equals zero." Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

Juror Bias

Petitioner next claims that he was denied his right to a fair trial because jurors Kathleen Barbizon and Yvette Cage failed to reveal their biases during voir dire. The state district court originally granted petitioner a new trial based on this claim;[29] however, that judgment was

---

[29] State Rec., Vol. VIII of XVI, minute entry dated February 7, 2002.

reversed by Louisiana Fourth Circuit Court of Appeal,[30] and the Louisiana Supreme Court then denied petitioner's related writ application.[31] When petitioner again raised the issue on direct appeal, the Louisiana Fourth Circuit Court of Appeal denied relief, explaining:

> Mr. Newman contends that this Court should not have reversed the trial court's decision to grant his motion for a new trial. The State, however, argues that Mr. Newman has not presented any new evidence that would justify overruling this Court's earlier decision. The State also argues that the earlier decision is the law of the case and should not be now disturbed.
>
> In State v. Gillet, 99-2474 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, this Court discussed the law of the case doctrine as follows.
>
>> This Court has stated that "an appellate court will not reverse its pretrial determinations ... unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. While a different decision on appeal is not absolutely precluded, judicial efficiency demands that great deference be accorded to the earlier decision."
>
> 763 So.2d at 728 (citations omitted).
>
> After his conviction Mr. Newman moved for a new trial on the grounds that two jurors failed to disclose pertinent information during voir dire. One juror was alleged to have known Mr. Dupre, but she could not be served, so she could not be questioned regarding whether or not she had known Mr. Dupre.[FN11] Another juror was alleged to have been employed as a law enforcement officer at the time she served on the jury. This juror testified at the hearing on the motion for a new trial. She said that she had been a probation officer for one year [FN12] but that at the time of the trial, she was unemployed. She further testified that she did not disclose her prior

---

[30]  State v. Newman, No. 2002-K-0666 (La. App. 4th Cir. Apr. 10, 2002) (unpublished); State Rec., Vol. VIII of XVI.

[31]  State v. Newman, 840 So.2d 536 (La. 2003) (No. 2002-KP-1483); State Rec., Vol. VIII of XVI.

employment, because she was never asked about it during voir dire, something that she thought was unusual.

> [FN11]  There was evidence that both she and Mr. Dupre had attended Xavier University at the same time, but there was no evidence regarding the relationship, if any, between the juror and Mr. Dupre.

> [FN12]  We note that we do not agree with Mr. Newman's characterization of this juror as a "career law enforcement officer" in light of the fact that she was not employed at the time of the trial and had worked as a probation officer for only one year.

The trial court originally granted a new trial based on the fact that this juror had not disclosed during voir dire that she had once worked as a probation officer.  This Court, however, reversed the trial court's decision.  Based on a review of her testimony at the motion for a new trial, this Court determined that the juror had fairly and impartially considered the case against Mr. Newman.  Additionally, not only had this juror's background not prejudiced Mr. Newman, it may have also spared Mr. Newman from the death penalty.  She stated that "my knowledge of the law is why we did not give him the death penalty."

Mr. Newman still argues, however, that because one of the jurors allegedly knew Mr. Dupre, he is entitled to a new trial.  That juror did not testify at the motion for a new trial, but Mr. Newman's counsel argued that even without her testimony, it was clear that she knew Mr. Dupre, because there was evidence that they had attended Xavier University at the same time.  Because Mr. Dupre was a star player on the university's basketball team, Mr. Newman's counsel argued that the juror had to have known Mr. Dupre.  This argument presupposes, without any evidence, that the juror was a basketball fan.  Further, even if this juror were a basketball fan who knew of Mr. Dupre, this does not mean that they were friends or had any other type of relationship.

Attached to Mr. Newman's brief to this Court is an affidavit of Rasheed M. Lacour, in which he declared that he attended Xavier University at the time the juror and Mr. Dupre attended the university, that he knew both of them, and that he saw them together on campus on several occasions.  The affidavit is not part of the record in this case, however, and we cannot consider it.

We also note with respect to the allegation that a juror knew Mr. Dupre that the voir dire transcript reflects that an unidentified prospective juror, who was on the same panel as the juror who was alleged to have known Mr. Dupre, asked whether Mr. Dupre was a basketball player at Xavier. When the prosecuting attorney replied affirmatively, he asked the unidentified prospective juror whether she knew Mr. Dupre, and she said that she did. When the prospective juror was asked whether the fact that she knew Mr. Dupre would affect her ability to serve as an impartial juror, she said, "No, I didn't even know he got killed." The prospective juror did not know Mr. Dupre well, and she specifically stated that the fact that she had some prior knowledge of him would have no effect on her ability to serve as a fair and impartial juror. In all likelihood this prospective juror was the juror that Mr. Newman now claims knew Mr. Dupre. If so, she clearly did not have a relationship with him.

Based on the voir dire transcript, the transcript of the testimony of the juror who had been employed as a probation officer prior to the trial, and our prior review of the trial court's decision granting a new trial, we find that there is no reason to reconsider our earlier decision reversing the trial court's decision. This assignment of error is without merit.[32]

"The Sixth Amendment right to a fair trial includes the right to an impartial jury." Miniel v. Cockrell, 339 F.3d 331, 338 (5th Cir. 2003). However, a juror's past or present employment in law enforcement is not grounds for automatic disqualification. United States v. Morales, 185 F.3d 74, 83-84 (2nd Cir. 1999); United States v. Blum, 65 F.3d 1436, 1442 (8th Cir. 1995); United States v. McIntyre, 997 F.2d 687, 697 (10th Cir. 1993); United States v. Bryant, 991 F.2d 171, 174 (5th Cir. 1993); United States v. Bilecki, 876 F.2d 1128, 1130 (5th Cir. 1989); United States v. McCord, 695 F.2d 823, 828 (5th Cir. 1983); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *15 (E.D. La. Oct. 29, 2009). The mere fact that a juror knew the victim likewise does not disqualify the juror from serving. Montoya v. Scott, 65 F.3d 405, 419-20 (5th Cir.

---

[32] State v. Newman, 879 So.2d at 883-84; State Rec., Vol. XIII of XVI.

1995); Jones v. Butler, 864 F.2d 348, 362 (5th Cir. 1988); Howard v. Davis, 815 F.2d 1429, 1431 (11th Cir. 1987). Rather, the critical consideration is whether "the prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Soria v. Johnson, 207 F.3d 232, 242 (5th Cir. 2000) (internal quotation marks omitted). There is simply no evidence that Barbizon and Cage were unwilling or unable to decide the case impartially according to the law and the evidence, and, therefore, this Court should defer to the state court decision denying relief.

<u>Grand Jury Discrimination</u>

Lastly, petitioner claims that he was denied equal protection of law due to discrimination in the selection of the grand jury foreperson. Regarding such claims, the United States Fifth Circuit Court of Appeals has held:

> A constitutional basis for relief from discrimination is not proved merely by suspicion or loud outcry. The prerequisites for federal relief from the allegedly discriminatory selection of a grand jury were established in Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The petitioner must: (1) establish that the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment; (2) prove the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve, here as foremen, over a significant period of time; and (3) support the presumption thus created by showing that the selection procedure is susceptible to abuse or is not racially neutral. Id. at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510, cited with approval, Rose v. Mitchell, 443 U.S. at 563, 99 S.Ct. at 3005, 61 L.Ed.2d at 754. See United States ex rel. Barksdale v. Blackburn, 639 F.2d 1115, 1121-1123 (5th Cir. 1981) (en banc). Once these prerequisites have been proved, a prima facie case has been established and the burden shifts to the state to rebut that showing.

Guice v. Fortenberry, 661 F.2d 496, 499-500 (5th Cir. 1981).

In the instant case, petitioner's claim was rejected by the state courts due to his failure to establish a *prima facie* case of discrimination. On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected petitioner's claim, holding:

> Mr. Newman contends that the procedure by which Orleans Parish grand juries and grand jury forepersons were selected at the time of his indictment was susceptible to discrimination. In particular, Mr. Newman alleges that there was systemic discrimination against black males in the selection of grand juries such that he was denied his rights under both the state and federal constitutions.
>
> In <u>State v. Fleming</u>, 2002-1700, p. 5-6 (La.App. 4 Cir. 4/16/03), 846 So.2d 114, 120, <u>writ denied</u>, 2003-1391 and 2003-1393 (La. 11/26/03, 860 So.2d 1132), this Court discussed the legal framework for analyzing claims of discrimination with respect to grand jury selection as follows:
>
>> To demonstrate an equal protection violation based on discrimination in the selection of the grand jury itself or the foreperson, a defendant is required to establish a *prima facie* case of purposeful discrimination. Under the seminal case, <u>Castaneda v. Partida</u>, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a *prima facie* showing of purposeful discrimination is established by proving "over a significant period of time" that "substantial under-representation" has occurred of a "recognizable distinct class, singled out for different treatment under the laws." ... One method of establishing such purposeful discrimination is by satisfying the following three-prong test:
>>
>> 1. Those alleged to be discriminated against belong to an identifiable group in the general population.
>>
>> 2. The selection process is subject to abuse according to subjective criteria.
>>
>> 3. The degree of underrepresentation, as shown by comparing the proportion of the group at issue found

in the general population to the proportion called to
serve.

If we apply the analysis discussed in <u>Fleming</u> to the facts of
the instant case, the first two prongs of the test are not at issue. First,
it is undisputed that black males constitute an identifiable group
capable of being singled out for disparate treatment. Second, it is
undisputed that the procedure for selecting both the grand juries and
the grand jury forepersons in Orleans Parish at the time of Mr.
Newman's indictment was subject to abuse according to subjective
criteria that could include race and sex. The dispute arises in
connection with the third prong of the test. Mr. Newman, however,
did not present any statistical or other evidence to support his claims
of discrimination.

To succeed in claiming discrimination in the grand jury
selection process, Mr. Newman was required to present a *prima facie*
case supporting his allegations. Mr. Newman's trial counsel stated
that the motion to quash dealt with "the general process and not any
specifics as to how my client is impacted in any specific instance."
Mr. Newman presented no evidence in support of his motion when
he had the opportunity to do so. This assignment of error is without
merit.[33]

Petitioner acknowledges in his federal application that his counsel presented no such evidence in

support of motion to quash.[34] Because no evidence was offered to prove the degree of

underrepresentation, petitioner's motion was properly denied and *habeas* relief is not warranted in

this Court. <u>Schexnayder v. Cain</u>, Civ. Action No. 08-294, 2009 WL 3242552, at *7 (M.D. La. Oct.

8, 2009); <u>Stogner v. Cain</u>, Civ. Action No. 05-4317, 2008 WL 269078, at *9-10 (E.D. La. Jan. 30,

2008), <u>aff'd</u>, No. 08-30216 (5th Cir. June 30, 2009), <u>cert. denied</u>, 130 S.Ct. 471 (2009).

---

[33]  <u>State v. Newman</u>, 879 So.2d at 881-82; State Rec., Vol. XIII of XVI.

[34] Rec. Doc. 3, pp. 30 and 32-33.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Gordon Newman be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[35]

New Orleans, Louisiana, this twelfth day of April, 2010.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[35] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.